Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

1  Jordan Service, Self Pro Se          }

2  7111 Santa Monica Blvd Ste B# 125    }

3  West Hollywood CA, 90046             }

4  Telephone 954 817 4530               }

5  Email JordanService@gmail.com        }

FILED
CLERK, U.S. DISTRICT COURT

2/24/23

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ SE _____ DEPUTY

6

7              -----------------------------------------------

8                    **United States District Court**

9                              **For The**

10                **Central District of California**

11

12  Parties: Counter-Plaintiff        } [Assigned to the Honorable

13  and Defendant Jordan Service      }     Otis D. Wright II]

14            VS                      }   2:22-cv-02484-0DW-PVCx

15  Joshua Edelman, Edelmania,        }   DKT : 43 **Second Amended**

16  the Plaintiff and Counter-Defense. }     **Counter Complaint**

17

18

19

20

21

22

23  COMES NOW, Jordan Service's (The Defendant) ***Second Amended Counter***

24  ***Claim*** to the initial complaint (2:22-cv-02484-0DW-PVCx) from Josh Edelman,

25  and Edelmania LLC. (The Plaintiff)

26

27            **<u>The Defense files a Counter Complaint.</u>**

28

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

## Background

1. Josh Edelman was one of my best friends. We had met in 2012 through mutual acquaintances and we were both young producer/directors. Josh was making a web series called, "Best Friends" under his "Edelmania," and I was making sketches with Ryan Sulak as, "Future Space Cadets." I was also directing more serious projects by myself under the title, "Service Media Group."  Josh and I would both help each other out in various productions, from assisting on film sets, to having Josh act in a few Future Space Cadets videos. We would not only make videos but would often discuss film, video, and sketch projects, both in person and in online chat. As young producer/ directors none of our projects were very profitable, so we would also work separately in larger productions to make money to pay the bills, as well as to fund our passion projects.

## Digital Bolex Camera

2. Since late 2014 and early 2015  I own a rare Cinema Camera called the Digital Bolex. I run the rental website, www.DigitalBolexRental.com and rent the camera out for 300 dollars per day, plus lenses. I also use this camera on projects I have, and am currently, directing.

## Al Lubel Documentary Initial Filming

3. In the later part of 2015 Josh conveyed to me how Al Lubel reach out to him on twitter and was excited by a potential project with the comedian. As close friends, Josh took me to see a set of Al Lubel and I was an instant fan of his "out-there" comedy.

4.A few days later, Josh reached out to me to borrow my cinema camera in order to film a set of Al Lubel. Josh offered 100.00$ to borrow my cinema camera. As Josh did not have production insurance, I declined Josh's offer to "borrow" the camera

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

for 100$. Instead I offered to film the set for free, which would help him out, and would not require him to have insurance as I would be present and responsible for my equipment in case of damage.

5.In early 2016, after filming a few sets of Al's, for free as a favor.  Josh wanted to turn what we had been filming into  a documentary feature film in order to potentially attract a budget to film a comedy special.  Josh then asked me, multiple times to come on board the project as the Director of Photography. I was reticent in taking on such a large project for no money, as it would be a major investment of my time and equipment, and take away from paid work.

6. I spoke to Josh about the project and we agreed that the film would be a co-production of Josh Edleman and Jordan Service, and specifically not through Edelmania, nor Future Space Cadets. Josh was to be the Director/ Producer, and Jordan the Cinematographer/ Producer. We were to split the production 50/50. This split was after Josh's 50/50 split with Al Lubel. As Josh was to be the director, he also agreed to be the 'financing party' paying for upfront costs, to offset my contributions of the equipment costs. IE Josh would cover meals, travel expenses ect, and keep a record of receipts to be repaid, while I would provide all my equipment at no cost.

**"Al Lubel Documentary" Production**

7. Throughout 2016, we filmed the majority of the production in Los Angeles, as well as a trip to Atlantic City, and Florida. At the end of the Florida trip, Josh went on vacation with his family. I continued to film with Al, flying out of Tampa and back to Los Angeles. At this time I filmed the epilogue sequence and interviews, as well as a live comedy show back in Log Angeles, all while Josh was on vacation.

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

8. Through out 2017 and 2018 we continued to film select interviews, while editing the film and completing various post production tasks on the film, like scanning still photographs, searching archival footage, completing vfx composites, color correction and other tasks. We were also at this time preparing sales materials: pitch packets, trailers, as well as synopsis, movie descriptions, and "loglines."

**"Mentally Al" Sale Strategy**

9. In late 2017 and early 2018 we completed sales materials and were submitting to film festivals in order to attract buyers. As new producers of feature films, we had focused our efforts on selling the film, and did not discuss the option of distribution offers. We were hoping to land the sale as an "original" to Netflix or HBO. We were attempting to package the completed documentary with an un-produced comedy special, to which we would also be hired to make.

**Mentally Al-- Distribution and Film Festival Failures + Conflict.**

10.At the end of 2017 and the beginning of 2018 we had been submitting to the film to major film festivals and had been uniformly rejected. Josh was bitter about his up front expenses, including film festival submission fees, and we were both burnt out from working on a project for nearly 3 years with no pay-- yet also both very proud of our film.

11. This lead to high-tensions culminating in the "breakfast meeting" at Millies Cafe on May 8th, 2018. Josh had expressed to me that he wanted more help in the distribution of the film, and wanted me to pay upfront costs of additional film festival submissions. Josh asserted that I needed to earn my "Producer" credit through helping with the distribution of the film.

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

12. I expressed that I already have fulfilled any supposed 'requirement' through the creation of the film over the past nearly 3 years. Specifically my involvement as the Producer, the Cinematographer, providing my equipment, as well as the many days as post-Producer to help craft the edit and story, multiple sessions of graphics, VFX,  photography, sales and pitch material creation, and various other tasks that I performed the during the production and post production of the film, all of which was fully unpaid.

13. I was shocked at the audacity for Josh to frame my involvement as conditional when we had been functioning as partners in a joint production for nearly 3 years. I expressed that I will continue to help the film in any capacity that I could. But also that I was very tight on money, as I had been working on this project for nearly 3 years with no pay, and could not afford film festival submissions. I also said, that as production is over, and we are focusing on distribution, my involvement should naturally start to be less as I had little experience in film sales.

14. Previous to the meeting Josh ensured via text that this meeting was "not about contract renegotiation." So I assumed he was airing out grievances and frustrations of not getting into film festivals as is common for creative partners to lean on each other when you go through the ups and downs of rejections and submissions. As we left the meeting I was excited to continue to push the project in any capacity and determined to bring the project all the way to it's conclusion, though I couldn't help pay for submissions.

**May 16, 2018 Agreement**

**15.** On May 16, 2018 , eight-days after the Millies cafe "Breakfast meeting," I met Josh for a meeting in the normal course of business.  Josh presented me with a "agreement" unannounced.  Josh did not inform me this would be happening, so I

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

was unprepared. Josh informed me it was a request from Adam Liepzig, a consultant who only had contact with Josh, and that it was in order to go out to the market to get a sale for the entire package.

In the days between the Millie's Cafe "breakfast meeting" the arguments had subsided, and I assumed that the tensions were settled.

16. I could tell by Josh's manner that this was important to him, or that he had a sense of urgency. I also wanted to avoid conflict as much as possible. In reading through the contract a few specific things reassured me.

1. "Clause-1" Establishes "Al Lubel, Josh Edelman, And Jordan Service as team.
2. "Clause-1" Establishes that 100 of the project belongs to Al Lubel, Josh Edelman and Jordan Service: "His percentage is based on a 40/40/20 split."
3. Clause-1 Establishes "Anything that affects the rate of one member of the team affects the rates all members of the team proportionally."
4. That Clause-11 implies this is an informal agreement, and a "more formalized" agreement would be presented.
5. There was no mention of "work for hire" nor "transference of copyright."

17. Tensions had been high, and I was not looking to create a conflict. As this had been the equity splits we had eventually agreed upon, I signed the agreement, to which Josh expressed relief saying, "that was easier than expected." I thought that was odd as he down played the significance of the agreement before signing. However, I was hopeful that my partner and "teammate" of nearly 3 years would be settled.

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

**The Second Festival Run**

18. In the period after May 16th, we had started to come to terms with the fact that Josh and I were burnt out and had little capacity to push the distribution of the film after a grueling production and post production process.

19.It was decided that Daniel, "Dano" Marino, our mutual friend and Josh's best friend from childhood would be elevated from his previous role as production assistant to co-producer in order to help organize another festival run focusing on smaller film festivals.  In exchange for his work, and upfront investment to pay for the festival submissions, Dano would receive 10% of the film, as well as a preferred repayment of his cost + 10%, which was the same as Josh preferred cost repayment rate.

20. In this capacity, the the film went on to get in over 20 film festivals through the end of 2018 and through late 2020.

**Approach by Comedy Dynamics**

21. In early 2020 I was informed of interest in the film by Comedy Dynamics, as this was being run by Dano, I was mainly in contact with him. Josh in the interim time had been spending more time doing stand up comedy himself, and gaining momentum in the scene and created his own stand up show "Gripe Juice".

**February 12, 2020 Comedy Dynamics Initial Offer**

**22.**On February 12, 2020 Dano was given the initial offer of the film by Brian Nitskin. Dano informed Josh four days later on Sunday February 16th.

23. Three weeks pass. On March 7th 2020, I was informed of the Comedy Dynamics Offer from Josh through forwarded messages, which now reveal the 3

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

week delay, however, I did not notice the difference in time, and thought I was receiving updates in real time.

24. In the description of the deal, no party was mentioned by name, instead the non descript term "Licensor" was used. I did not notice this detail at the time.

25. Both Josh and Dano use personal emails yet Brian Nitzkin uses his Myriad-Productions email. There is no mention of "Edelmania" and it returns zero matches when searching the document.

**Responding to the Initial Offer March 8th**

26. On March 8th One day after being informed of the offer I  respond to Josh Edelman, jre239@gmail.com, and  Dano Marino danocmarino@gmail.com and express concerns with the deal:

27. "I do not see me accepting this as is--especially with this little information. It is not detailed enough. And I would want to see prior cases studies. Other wise, it is too general for 25 years and would rather have the rights. -Jordan"

28. Dano responded saying, "I will discuss with you later." And "We don't have chips with out other offers."

**May 13th , 2020 Further Discussions.**

**29.** Nearly ten weeks later in May, Dano and I discussed the good developments of the deal as I been informed the term of the deal was reduced from 25 years to 7 years. We also discussed  further concerns as I had been given a review of Comedy Dynamics as a company and how they are founded by Tom Green. I was also informed that they have made specials with comedians with large audience and

`Case: 2:22-cv-02484-0DW-PVCx  Filed Amended 2/24/23`

followings like Bo Burnham. I was concerned that unless social media mentions would be worded specifically in contract, I did not think we could guarantee them as a marketing advantage. I was requesting to see a detailed plan, and never received any further details, nor any further paperwork.

**Summer 2020**

30. The Covid-19 pandemic began to shut down film festivals and trigger quarantine protocols in Los Angeles. As events moved online, the film continued to get into virtual events, and in some cases, physicals events during periods of low covid-19 transmission.

**Autumn 2020**

31. Starting with the Hollywood Film Festivals: Comedy premiere I noticed that Josh was presenting himself as the Director, and me as the DP/ Cameraman, not as a film making duo in a joint production.  While Josh's representation of the facts was not technically untrue, I had always pictured that we would go to festivals as two filmmakers, a Director-Producer and Cinematographer-Producer pair, and felt like his representation diminished my deep involvement in the film as a producer, in a joint 2 person production over 3 years. The framing Josh represented in 2020 was very different from what we had discussed and what had actually occurred, starting all the way back in early 2016 and through out the production as producing partners.

However, I dismissed my fears as I knew Josh was some one who loved the spot light and that I shouldn't be bothered by Josh reveling in the attention.

**32. In October 2020,** after receiving a link to an online review, the you-tube algorithm automatically recommended the video interview  between Josh and Al as

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

"the filmmakers," which I was never informed of, nor was it sent to me. I was very upset with this description and lack of inclusion, and I asked to be informed if there would be any further press as a producer.

33. Around this time I received an Alignable request from Dano Marino, from Edelmania Productions.

**Winter 2020**

34.  I had expressed questions about why it was being packaged under Edlemania. I asked when this happened and Dano and Josh both separately dismissed it's importance saying it's really through Comedy Dynamics. I grew increasingly curious about how the deal would be structured under Edelmania as I had not seen any paper work nor do I have any formal relationship with Edelmania, and I expressed this desire to see the paper work in discussions.

35. As the delivery date approached. We were making final materials for the submission. For this, I edited a trailer, and even designed and animated a "Vanity" card for "Edlemania" as a favor to Josh because his version was not animated professionally. Even at this late date I had still not been presented with any formal paperwork on the deal, and was growing increasingly anxious by the delay.

**January 2021 Delivery to Comedy Dynamics**

36. As the delivery date was days away, and I still had not received any formal paperwork. Josh contacted me about some last minute credits issues. He told me the I would not revive Second Unit Director, credit any more. This was extremely odd to me, not only because the credit is small and justified to the facts of production, but more importantly because I am one of the Copy Right holders of

the film, and this should be a discussion. He also revealed to me that it was 'his film, and he has full control.'

37.My visions of us going into Comedy Dynamics, handing off the materials, and signing the final paper work together, as a team, was never going to happen. I realized that I needed to enforce clause 1 of the May 16th agreement, because I have never seen any contracts with actual final splits. I was also confused as to how this could be structured between Edelmania and Comedy Dynamics, if I have no contract with Edelmania nor Comedy Dynamics. Ie there is no paper trail connecting me to the film, and this worried me.

**Requesting the formalized agreement**

38. With the final delivery days away, on February 10th I send an email out to Al, Josh and Dano. In the email I ask for details on the deal so I can review the deal with my legal team,  I go onto say:

 "Our goal should ***be to properly structure the terms we previously agreed to*** before things get too deep with Comedy Dynamics. "

This email still has no response.

**Second Request for a formalized agreement**

**39.** On February 11th I send a second email to Josh Edleman where I attempt to settle and clarify ownership of the film based on the deal memo from May 16th 2018.

"I have not heard back from you regarding communication to clear up matters regarding ownership of Mentally Al that I have been repeatedly trying to settle. If I

do not receive communication from you clarifying your intent to settle ownership in good faith based off of our original deal memo by the end of business today, February 12th 6:00pm, I will proceed to communicate directly with Comedy Dynamics regarding the chain of title not being complete for Mentally Al. I would rather settle things privately, fairly, and quickly, as I am sure you would also want. I will also not hesitate to escalate this situation to ensure that my rights are being protected as per our deal memo and previously communicated understanding about my role in the project, my credit, and my compensation."

This email has no response.

**Filling Copy Right Claim. February 11th**

**40.** After not receiving any enforcement of clause 1 of the May 16th agreement, nor was there any plan to provide me with a more formalized paperwork. I filled for a shared copyright claim with the US government under the names of the original team, Al Lubel, Josh Edelman, and Jordan Service.

**Informing Comedy Dynamics of My Request to Enforce my Rights**

41. On February 12th – after reading Brian's introduction, I respond to Brian Nitzkin and include Anna Roberts of Comedy Dynamics informing them of my position:

*42. Hi Brian and Anna,*

*Nice to e-meet you both! I'm so excited to be going through Comedy Dynamics, I think it is a great home for our movie, and thanks so much for your help with brokering it Brian.*

Case: 2:22-cv-02484-ODW-PVCx   Filed Amended 2/24/23

*Yeah, as Brain mentioned, I do have some questions about the deal. We just want to see the paperwork to ensure our rights are being considered and there is a clean title. If you can send all the information on the deal and the structure of the deal to me that would be great so my team can review.*

*I'm so excited to see the film released and out there we just want to make sure everything is right on our end so there is a clean title to everything before going out any further.*

*Best,*
*Jordan Service*
*Producer, Mentally Al*

*PS: If there is a more appropriate person at Comedy Dynamics please forward this along.*

**Brian Nitzkin's Response**

**43.** Brian's response confirmed that Josh had be misconstruing my involvement in the film, by down playing my involvement besides being the Director of Photography:

44. "I would prefer to speak today if possible - because I'm a little confused as to your request. I am aware of your agreement with Josh for your services as DP."

45. At this point I decided to retain a lawyer. JR Dimuzzio of Bernstein Law. I had also consulted with other attorneys, specifically Matt Trejo of Yang Law.

**Discussion with Brian Nitzkin**

**46.** I was in formed by my lawyer that the discussion with Brian did not go well. Brian presented himself as being in charge of legal issues and my lawyers engaged

with him as an attorney. Brian explained their position that the May 16th Agreement made it so I had no rights to see any terms of the deal, my lawyers argued that I had a right to enforce clause-1 and ensure the splits are pro-rata. However, they learned through the course of the conversation that Brian Nitzkin is not an attorney. My counsel had to end the conversation as it was not appropriate to be speaking to a person who is not party to the issue. Brian conveyed that he didn't know about the origination of the project and he was doing it as a favor for Dano, and the call ended.

**Notice from Bernstein Law to Josh**

**47.** On March 17th 2021 My lawyers contact Josh Edelman in order to start a discussion so we could formalize the May 16th , 2018 agreement, and so I could see paper work and accounting that would enforce clause-1 of the agreement, as I have never seen any paper work beyond the May 16th agreement.

48. My lawyer specifically mentions the May 16th, 2018 agreement:

*Please be aware it is not Mr. Service's intent to in any way jeopardize the status of "Mentally Al," or any current deal regarding the same. Rather, Mr. Service wishes to see a more formalized version of the "deal memo," s**igned by Mr. Service and yourself, on May 16, 2018**, come to fruition.*

**Josh Edelman's Response**

**49.**Josh rejects any discussion, and implies that I am not a relevant party. Josh then bizarrely claims that my lawyers are not aware of the May 16th agreement, and falsely asserts that he had taken efforts to discuss the matter. Finally, while not being a lawyer, nor taking my issues, nor claims, nor my attempts to come to an agreement seriously, Josh proclaims the agreement is legally binding, while not

```
Case: 2:22-cv-02484-ODW-PVCx  Filed Amended 2/24/23
```

agreeing to show me any paperwork that would enforce my rights of the same agreement.

**50. Bernstein Law Reaches out to Comedy Dynamics to which there is no reply.**

Planning Next Steps With Bernstein Law

51. My lawyers expressed that we would need the court to push this further as they are ignoring our requests. As my 1,500$ retainer was spent, in order to go to the next phase of filing suite they would require a retainer of 15,000$ to 25,000$. They said they thought "Josh screwed you." But if the film will probably not gross anything, pursuing anything else would not provide a return on investment to costs of the case. They also informed that it is common to change lawyers pre-trial. Not being able to afford the further retainer, In Autumn of 2021 I cease representation from Bernstein.

**Enforcing my Rights.**

52 In December of 2021 after consulting with an industry lawyer about the matter she agreed that I should enforce my copyright as there has been breech of contract. I issue take down notices of the film Mentally Al.

**Steven Vondran**

**53** In the beginning of 2022 I was engaged with Steven Vondran Esq. retained by Edelman.  On January 9th, 2022 while grieving my grandmother's passing, I respond in detail explaining the facts of the production as well as Josh's avoiding any dialogue:

*"As it stands, my legal team and I have reached out many times in order to clarify*

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

*the matter and to ensure my rights as an equity holder as well as my profit splits. Every request has been denied."*

Mr. Vondran would not engage in discussion besides issuing one sided demands.

**Bandlow Letter**

**54.** On March 11th, 2022 I was sent an email and letter by Mr. Bandlow. Mr Bandlows reasoning was bizarrely inconsistent with the facts with demonstrable lies. His legal theories were also not addressing the facts of the production, nor was providing any opportunity to come to a reasonable agreement.

55. Upon receiving the letter from Mr Vondran, I looked up his public record and was impressed by him, specifically his you-tube channel. I went out of my way to engage with Mr. Vondran as soon as possible, even when my Grand Mother had passed. In looking up the public record of Mr. Bandlow, I found cases of legal bullying, and in reading his demand letter, saw there was not point in communicating directly, so I began to seek out an attorney-- pro-Bono, or contingent, while waiting to see if they would file suite.

56. On May 9th , 2022, I find notice of the law suite and prepare my response while trying to engage with a lawyer, from Yang Law.

**Jordan Service Financial Position**

57. Between the end of 2015 through 2021, I provided countless hours of unpaid work to create the film Mentally Al.

58. Starting in 2020 after slowly getting back on my feet from self funding such a long project, the pandemic hit, closing down production. In 2020, I grossed around 11,000$ and in 2021 around 24,000$. These facts prohibits me from being able to

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

hire and retain a lawyer, and engage seriously with the opposition to come to a settlement, though I have tried many times, as the records show.

**Additional Facts and Summary**

59.  Through 2015 to 2018 Josh Edelman, and Jordan Service created the film Mentally Al, with Al Lubel. There were only 2 creators of the film, with Al Lubel acting as talent. Any additional help was work for hire, or came involvement after the production of the film was over.

60. This is a small and intimate production, between 3 individuals forming a team, not originated by a company, this is why the emails are personal emails and not using business emails.

61. The film Mentally Al, represents my life largest investment, both creatively and financially.

62.  I have not been paid for my significant time in making the film. All requests to see any documents and accounting have been denied.

**Arguments For Fraudulent Inducement of the May 16th Agreement**

63. (I)  Edelman represented to Service that a fact was true-- that the May 16th agreement was an informal agreement to shop the film around according to Edelman and Service's plans at the time, and was not a "renegotiation";

64. (II) However, Edelman later used the May 16th Agreement to falsely claim that the Agreement transferred copyrights from Service to Edelman;

65. (III) Edelman misled Service in the creation of the May 16th Agreement, as well as Misled and lied to distributors about the May 16th Agreement and Origins

of the Film; By downplaying the Agreement's significance to Service, by misrepresenting Service as a work for hire to Brian Nitzkin, obscuring the origins of the film as a joint production to Comedy Dynamics, and falsely using the May 16th Agreement to transfer the rights of the film to Edelmania.

66. (IV) Service trusted Edelman's representation of the May 16th Agreement as informal and was not aware of how the contract would be eventually used nearly 2 years later, by Edelman using the Agreement to falsely transfer the copyright of the film to Edelmania.

67. (V) Service relied on Edelman's description of the nature of the agreement and it's informality in "shopping a deal", and would not have signed it if he knew that Edelman would use it to take control over the film individually under Edelmania. Which is not in the matter that they had arranged while making the sales materials.

68. (VI)Service was misled by Edelman which led to the effective loss of his copy right to the film.

69. (VII) Service's  reliance on Edelman's honest use of the agreement representation was central to this loss as Edelman used the May 16th Agreement in a manner contrary to the conditions on which it was signed , and which was written nearly 2 years earlier than the fulfillment of the Comedy Dynamics deal to which the agreement was being used to clear.


70. Joshua Edelman had knowledge of the joint production, and also showcased mutual intent to the joint copy right in the pitch-book to which he was the author of that revision. The revision he claims he authored included the copy right, "Josh Edelman, Jordan Service, and Al Lubel."  Joshua presented a contract either deceptively to My self, or enforced the contact in a misleading manner to Comedy Dynamics, or both. In any case, Edelman used deception and his position in selling the film for the "team"  to mislead and misrepresent the role of Edelmania to Comedy Dynamics, and to myself. This creatiedreal damages in the release of the

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

film.

71. These action under taken by Mr. Edelman, are intentional, in order for him to sell the film from the "team" to his own company Edelmania. This would effectively grant the ownership to Edelmania, a sale, but with out anything for "the Team." This sleight of hand fails a simple "this for that" condition, as Edelmania gains control of the film, with out anything going to "the Team." The entire language of the of the May 16th Agreement was in order to sell the film to a third party-- not to Edlemania, in order to make a comedy special which Edelmania had no funding to produce. It is clear that the use of the May 16th agreement as a "bill of sale" of the film, from "the Team" to Edelmania is a misuse of the agreement, which is supported by the sales materials, and general business plan. This was an intentional act of Mr. Edelman to be solely in control of the film under Edlemania, and to defraud Mr Service, and Lubel of our shared Copy Right interests to the film.  These acts are the scienter of intent required for Fraud charges.

## First Claim For Relief
## (Declatory Relief)

72. Defense incorporate the allegations of paragraph  1-71above though as fully set forth herin.  73. A real and actual controversy exists between the plaintiffs and the defense.

74 Defense contends that: (1) in accordance with 17 U.S. Code § 201 the joint authors of the film are Al Lubel, Josh Edelman, and Jordan Service. (2) Josh Edelman has no right to transfer the copyright from the group. (3) Edelmania has no exclusive claim to the Copyright. (4) The "Agreement" never transferred copyright, and yet was also  fraudulently misrepresented by the plaintiff.

Case: 2:22-cv-02484-ODW-PVCx   Filed Amended 2/24/23

## Second Claim For Relief - Amended
## (Fraud, Fraud in the Inducement, CA Civ Code § 1709, 3294-3296, 3439-3439.12  )

75.  Defense incorporate the allegations of paragraphs  1-74 above though as fully set forth herin.

76. Defense contends that Edelman fraudulently misrepresented the May 16th, 2018 agreement.

77. Further, Edelman engaged in a campaign of mis-information and used his position to control the flow of information between the parties responsible for the production, and the parties responsible for it's distribution.

78. Edelman used the timing of the release of the film to the distributor in order to pressure his altered view of the facts of the production.


## Third Claim for Relief - Amended
## (Misrepresentation under 17 U.S. Code § 201, 504)

79. Defense incorporates the paragraphs 1 - 78 above though as fully set forth herin.

80. Defense contends that Edelman  has misrepresented the film as the sole author, depriving Jordan Service and Al Lubel of their shared copyright.


81. Edelman did not file for limitation of pre-exiting materials, which would include Al's standup sets as well as significant claims on archival material.

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

<u>**Payer for Relief**</u>

1. **For the First Claim for Relief:**

a. A declaration by the Court that states:

    I. Al Lubel, Josh Edelman and Jordan Service are the joint authors of the Film.

    II. Al Lubel, Josh Edelman and Jordan Service are the current shared copyrights holders of the Film.

    III. Josh Edelman is not the sole author of the film.

    IV. Edelman is not the copyright holder to pre-exsiting archival work.

b. Injuctive relief ordering Edelman to cease.

    I. Engaging in exclusive deals with Comedy Dynamics,

    II. Order the formation of an LLC (or entity) that controls the Film.

    III. Order the company to grant Edelmania a license in order to validate the entire chain of title.

    IV. Order Edelmania to provide the full accounting to the new LLC.

C. Defenses "Reasonable attorneys fees and costs" under 17 U.S.C.§ 505

2. **For the Second Claim of relief.**

A. A declaration by the Court that states:

    I. Edleman Fraudulently induced Service into the May 16th Agreement voiding the Agreement.

B. Damages. Under CA Civil Code SECTION 3294-3296 Exemplary Damages, in the case of Fraud.

C. Damages. Under Ca Civil Code **SECTION 3439-3439.12** UFTA

D. Damages.  CA Civ Code § 1709

3. **For the Third Claim of relief.**

a. Injunctive relief in ordering:

Case: 2:22-cv-02484-0DW-PVCx   Filed Amended 2/24/23

I. The invalidation of Edelman's copyright claim as misfiled without limitations.

II. The invalidation of Edelman's copyright claim as misfiled as sole author.

b. Damages. Under 17 U.S.C.§ 504, 505

c. Punitive damages.

d. Defenses "Reasonable attorneys fees and costs" under 17 U.S.C.§ 505

**4. For all claims of relief:**

a. Prejudgment interest as allowed by law.

b. Such further relief the Court deems proper.

Dated: July, 5 2022

Amended: February, 24th 2023

By

Jordan Service, self, in Pro Se